UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

LANE CARTER                                   CIVIL ACTION: 18-0068, SECTION P

VERSUS

SHERRIFF ANDY BROWN, IN HIS          JUDGE TERRY A. DOUGHTY
OFFICIAL CAPACITY,

SHERIFF CRANFORD JORDAN, IN          MAG. JUDGE KAREN L. HAYES
HIS OFFICIAL CAPACITY

FOURTH AMENDED COMPLAINT

COMES NOW Plaintiff Lane Carter, by and through undersigned counsel, to file this

Complaint against the Defendants. In support, he states the following:

I.      INTRODUCTION

1.      Lane Carter was a healthy, hardworking 42-year-old man when he was imprisoned

at Winn Parish Jail in September 2019. For over ten years, the narrow shower in cell three at Winn

Parish Jail had a makeshift floor made out of plastic milkcrates, connected with plastic zip-ties,

where inmates showered, dried and dressed. Mr. Carter complained about these dangerous

milkcrates to deputy sheriffs at Winn Parish Jail, but nothing happened. On August 20, 2018, while

in the shower, Mr. Carter's foot fell into a hole in one of the worn milkcrates, and his other foot

slipped on top of another milkcrate. He fell backwards out of the shower causing significant

injuries, was unable to get up, was left naked, and wet, on the ground for two hours while Winn

Parish Sheriff Cranford Jordan reviewed video footage of the fall and decided whether to call an

ambulance. Mr. Carter was taken to the Winn Parish Emergency Department, who at this time

found Mr. Carter to be in moderate distress, with muscle spasms, and with a visible injury and

contusion along his spine.  Mr. Carter also complained of numbness and tingling in his extremities. The hospital prescribed medication for the pain and for the muscle spasms.  Mr. Carter was never taken in for follow up treatment as recommended by the ER, and despite requests, never received any other medical treatment at Winn Parish Jail.

2. On September 5, 2018, Defendant Sheriff Jordan transferred Mr. Carter to Jackson Parish Correctional Center ("JPCC"). Upon his arrival at JPCC, Mr. Carter was in clear distress. The intake booking sheet at JPCC shows that an EMT came to see Mr. Carter and, upon assessment, found Mr. Carter to be "very tender on the left side of body and is peeing blood at this time."  The record then states that Mr. Carter was to be transported to Jackson Parish Hospital, but the intake records show that he only showed up there eight days later.

3. Thus, after several days of complaining at JPCC, Plaintiff was finally taken to Jackson Parish Hospital on about September 13, 2019.  Clinical impression at Jackson Parish Hospital found Plaintiff with acute lumber and cervical radiculopathy, cervical strains, and herniated disc at the mid and lower cervical level and lower lumbar level with neck pain, radiculopathy, and sciatica – all trauma related.  Radiology imaging records from Jackson Parish Hospital show numerous disc herniations in Mr. Carter's spinal anatomy.  Besides Ibprofin, JPCC did not provide any follow up treatment to Mr. Carter for weeks. Mr. Carter's physical condition and pain worsened greatly over this time, he was unable to walk and required a walker or wheelchair. Because of his disability, Mr. Carter was moved to suicide watch cells, and then disciplinary lockdown, where most of his privileges and access to services were further restricted instead of accommodated. Moreover, in suicide watch and lockdown, he was frequently denied use of his wheelchair, limiting his opportunities to shower, use the restroom, and use other services offered to non-disabled inmates.

4.      A nurse recommended that he be allowed to shower in a special shower at JPCC for those with limited mobility, but instead, on October 27, 2017, a guard took Mr. Carter to a traditional shower with a walker and a plastic chair.  Mr. Carter fell from a height of 3 to 5 feet and landed on concrete when the chair and walker slipped on the slippery shower floor under his weight. He lost consciousness from the fall. Despite requests, Mr. Carter received no medical treatment for three days after the fall. He was taken to Jackson Parish Hospital and referred to physical therapy. Mr. Carter was admitted for treatment to the hospital on October 30, 2017, but after several days, he was released with little relief for his pain or loss of mobility. University Health in Shreveport found Mr. Carter's symptoms to include visual change/blurry vision, numbness in his extremities, and headaches.  An MRI reading also shows that one of the lumbar disc bulges is indenting on Mr. Carter's nerve root in his spinal canal. To this day, Mr. Carter is unable to walk without the assistance of a walker, and he suffers pain and numbness in his leg and body, is unable to control his bladder, and has suffered emotional distress from these injuries, and this mistreatment.

## II.      JURISDICTION AND VENUE

5.      Plaintiff's claim arises under the Constitution and the laws of the United States. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has jurisdiction over Plaintiff's state law claims in accordance with 28 U.S.C. § 1367.

6.      The venue is proper in the Western District of Louisiana under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in Winn Parish and Jackson Parish, Louisiana situated in the Western District of Louisiana.

## III.      THE PARTIES

7.      Plaintiff **Lane Carter** is of suitable age and capacity to file this suit. At all relevant time during this suit, Plaintiff was incarcerated in Winn Parish and Jackson Parish in the Western District of Louisiana.

8.      Defendant **Sheriff Cranford Jordan** is the Sheriff for the Winn Parish Sheriff's Office. He is sued in his official capacity. On information and belief, he is domiciled in Winn Parish in the Western District of Louisiana.

9.      Defendant **Sheriff Andy Brown** is the Sheriff for the Jackson Parish Sheriff's Office. He is sued in his official capacity. On information and belief, he is domiciled in Jackson Parish in the Western District of Louisiana.

## IV.     FACTS

10.     Mr. Carter was a healthy hard working 42 year old who was a manager at a retail store before his arrest in 2017. He was in good shape, and able to life heavy weights, which he often did for work.

11.     Mr. Carter was brought to Winn Parish Jail as a pretrial detainee on July 13, 2017.

12.     Winn Parish Sheriff, Cranford Jordan, is the custodian of the jail, and is responsible for the safety and care of all inmates housed at Winn Parish Jail. He is responsible for all daily operations of the jail, and for all movables in the jail.

13.     Winn Parish Police Jury was responsible for repair and maintenance of the jail building. The Winn Parish Police Jury never placed any milk crates at Winn Parish Jail in any shower.

14.     Mr. Carter was held in cell block three of Winn Parish Jail.

15.     The shower in cell block three was mildewed, molded, and slimy from standing water, lack of cleaning, and lack of drying.

16.     There were no handrails in the shower in cell block three.

17.     As far back as 2008, the shower in cell block three also had plastic milk crates on the ground allegedly to aid with the draining of standing water on the ground. The inmates had to stand on top of the milkcrates, which were held together by plastic zip-ties or other random ties, while they showered, dried off, dressed and undressed.

18.     The Winn Parish Police Jury did not receive any requests to repair or maintain the floor of the shower cell block three.

19.     While Mr. Carter was housed in cell block three, all of the crates were very worn, and one the milk crates was broken, producing a hole on the top side that was as large as Mr. Carter's foot. The shower was very narrow. As a result, it was difficult to step around the hole. The milk crates were also very slick when wet.

20.     Prior to August 20, 2017, Mr. Carter also complained that the shower crates were unsafe.

21.     On August 20, 2017, Mr. Carter tried to step around the hole, but his foot caught in a broken milk crate as he was trying to dress himself after his shower. As he reached down to pull out his foot, his other foot slipped. He fell backwards out of the shower on to the hard ground. He was significantly injured and unable to pick himself back up.

22.     Deputy Sheriff Todd Williams saw Mr. Carter fall out of the shower on the video surveillance. Deputy Williams came to see Mr. Carter after he fell, and left him lying on the ground for the next two hours, wrapped only by a wet shower curtain that had come down during the fall. Neither Todd Williams, nor any other employee, offered Mr. Carter any assistance as he lay on the ground in pain.

23.    Mr. Williams informed Mr. Carter that he was leaving to go call Sheriff Jordan. Then, Mr. Williams told Mr. Carter that Sheriff Jordan was reviewing video footage of Mr. Carter's fall to determine for himself if he was hurt. No one asked Mr. Carter if he was hurt, what assistance he needed, or if he was in pain.

24.    After two to three hours, an ambulance arrived.

25.    Deputy Tommy Chandler, Deputy Williams and another Deputy watched as Mr. Carter was put on a back board, and transported to the hospital.

26.    Mr. Carter was taken to Winn Parish Medical Center ("WPMC"). Discharge documents from WPMC advised that Mr. Carter be able to schedule an appointment with a primary physician within the next two to three days. However, Carter never received any further medical care at the Winn Parish Jail.

27.    At no time after Mr. Carter's accident, did the Winn Parish Police Jury receive any requests to repair or modify the shower in cell number three. In fact, the Winn Parish Police Jury was not ever notified Winn Parish Sheriff Jordan that any one fell in cell block three, or that there were any safety issues related to his fall.

28.    On or about August 23, 2017, Mr. Carter submitted a sick call for assistance. He got no response.

29.    On or about August 25, 2017, Mr. Carter submitted another sick call for assistance. Again, he got no response.

30.    On or about August 27, 2017, Mr. Carter asked Mr. Williams about his sick call requests, and said the Nurse had been told not to see Mr. Carter and that Sheriff Jordan refused to authorize any further medical care for Mr. Carter.

31. On or about August 29, 2017 and September 2, 2017, Mr. Carter submitted additional sick calls requesting medical assistance.

32. On September 5, 2017, without explanation, Mr. Carter was transferred from the Winn Parish Jail to the Jefferson Parish Correctional Center ("JPCC"). Mr. Carter was in pain and had a limp, but was still mobile when he was transferred.

33. When he arrived, the deputy sheriff working in booking stated that she had "heard" about Mr. Carter and that she was told he would say he was hurt even though there was "nothing wrong."

34. An EMT evaluated Mr. Carter upon arrival and found Mr. Carter to be "very tender on the left side of body and is peeing blood at this time." The JPCC record then states that Mr. Carter was to be transported to Jackson Parish Hospital, but the intake records show that he only showed up to the hospital eight days later.

35. Despite several sick call requests at JPCC, he was not seen by a facility nurse until September 13, 2017.

36. On September 13, 2017, was seen by Nurse Griffin, who then sent Mr. Carter to the Jackson Parish Hospital.

37. Clinical impression at Jackson Parish Hospital found Plaintiff with acute lumber and cervical radiculopathy, cervical strains, and herniated disc at the mid and lower cervical level and lower lumbar level with neck pain, radiculopathy, and sciatica – all trauma related.

38. Radiology imaging records from Jackson Parish Hospital show numerous disc herniations in Mr. Carter's cervical and lumbar spinal anatomy.

39. Over the next month, Mr. Carter was given ibuprofen, but no other treatment. During this time, his physical condition dramatically worsened. He experienced numbness and

7

"pins and needles" in his legs. He could not walk. He was provided a walker initially, and then a wheelchair.

40. On September 25, 2017, per one of his several "sick calls" requests, Mr. Carter stated, "[a]ny position other than flat of my back for more than a brief period of time keeps me in serious pain. Entire left hand numb. Left leg still has 'pins and needles' feeling, left foot numb, intense random pain in the right arm. Walking more than 25 feet is close to torture."  He was allowed to see a nurse 3 days later on September 28, 2017.

41. Once Mr. Carter's mobility decreased in October 2017, he was never able to go outside for exercise or recreation time like other inmates. In every dorm he was housed in at JPCC, there were no ramps to assist him to get outside, and there was a drop of several inches out of the door.

42. Additionally, deputies refused to bring Mr. Carter his food at mealtimes, but he could not carry food or drink and use his walker or wheelchair. Instead, they asked ungloved inmates to bring Mr. Carter his food. Mr. Carter often watched as those inmates reached their hands into his food or drink prior to handing it off to him.

43. From September to October 2017, Mr. Carter was unable to have any visitation because the visitation area was far from his cell and he was unable to access the area due to the distance between the cells and the visitation area.

44. Beginning in October, 2017, Mr. Carter was moved to the suicide watch cells. When he was moved, he lost his prison privileges including commissary, he was only allowed stationary privileges, and one five minute phone call a night, four stamps per week. His showers were limited, at times, going up to eight days without a shower. Other inmates were allowed to shower three times a week.

8

45.     On October 8, 2017, Mr. Carter submitted a sick call form asking for help: "I CANT WALK!"

46.     On October 9, 2017, Mr. Carter complained that he still could not walk and could not control his urine.

47.     Also in October 2017, Nurse Roberts ordered that Mr. Carter be given a handicapped shower to use that had a sit-down shower.

48.     On October 12, 2017, when he was seen by the JPCC's physician, but the doctor refused to treat him. His physical condition continued to deteriorate, and his disabilities worsened.

49.     On October 18, 2017, when being taken for a court appearance, JPCC staff threw him in and out of the vehicle in a "trust fall" out of the vehicle into the guards' arms, and the guards occasionally missed and dropped him. This outrageous conduct continued for all court appearances between September and December 2017.

50.     On Friday, October 27, 2017, Carter was instructed that he take a five-minute shower by himself with his walker and a plastic chair. He was not provided with his wheelchair.

51.     During the shower, however, Carter lost his balance as the chair pushed one direction, and the walker pushed the other direction on the wet floor. He slipped and fell, and hit his back and shoulder on the ground, and lost consciousness.

52.     The guard overseeing the shower instructed other inmates to carry Carter to his cell, and told him that he could not receive medical treatment until Monday when a nurse was present on site.

53.     On October 28, 2017, Mr. Carter filled out a sick call request regarding his fall on the 27th and explained that now both of his legs were numb, instead of just one.  The nurse also

noted in the report that Mr. Carter had a hemotoma on the back of his head, blurry vision, and a numb upper extremity, among other serious symptoms.

54.    On October 30, 2017, Carter was transported to the LSU Shreveport Medical Center emergency room where he was seen by an on-duty physician, a neurosurgeon, and a neurologist. After this fall, Mr. Carter's symptoms to included head pain, worsened neck pain, worsened/new back pain, visual change/blurry vision, numbness in his extremities, shoulder pain, and headaches. An MRI reading also shows that one of the lumbar disc bulges is indenting on Mr. Carter's nerve root in his spinal canal.

55.    An emergency room physician prescribed physical therapy and referred Carter to two outpatient clinics.

56.    Upon his return to the JPCC, a nurse told Carter that "there was no order for any form of therapy...." He was never given access to any physical therapy by JPCC.

57.    On November 5, 2017, Mr. Carter was moved out of the isolated suicide watch cell, and into disciplinary lock down, where he was held for the following month. The deputy sheriffs often refused to give Mr. Carter a wheelchair to use for hours, and even days. Without a wheelchair, he could not access the phones, toilets, showers, ice chest, and microwave. For many activities, he just gave up, but he had no choice but to find a way to get to the restroom, or into his bunk to sleep or rest. During those times, Mr. Carter tried to walk, and had several falls. Mr. Carter reported his falls to guards, and they told him to stop reporting his falls and ask the inmates in the cell for help getting up, getting to the toilet, or getting back to his bunk. Denied assistance, Mr. Carter had no choice but to crawl across the floor, whenever he needed to relieve himself. At times, he urinated or defecated on himself if he was unable to access the facilities because of his injuries.

10

58.     While other inmates were allowed to shower every day or two, at one point in November 2017, Mr. Carter did not get to shower for nine days.

59.     On November 21, 2017, Mr. Carter requested to be moved to general population, as he was threatened by other inmates.

60.     On December 3, 2017, the guards took his wheelchair away until December 4, 2017. They took it away for several hours again on December 5, 2017.

61.     On December 7, 2017, Mr. Carter was put back into the general population.

62.     There were approximately 100 persons in the dorm room, and there was one toilet for mobility impaired individuals, like Mr. Carter. It was often broken, and out of order for hours, days and sometimes weeks. As a result, Mr. Carter often had to use the traditional toilets, which lacked supportive railings, and resulted in him falling several times. There was only one phone at a lower height that Mr. Carter could reach from his wheelchair, it was also often broken, leaving him without phone access. Because of the furniture in the day room, Mr. Carter could not reach the microwave or ice chests from his wheelchair.

63.     Also in December 2017, Mr. Carter's mother provided him with a wheelchair she specifically purchased for him and his condition. However, at times, the guards would give Mr. Carter's wheelchair to other inmates, leaving Mr. Carter stranded.

64.     Mr. Carter was "taken to a neurosurgery clinic appointment" on December 28, 2017, and admitted to the hospital until December 30, 2017.  The hospital records note that his independent travel was affected by his injuries and he had difficulty with stairs, dressing and bathing.

65.     In 2018, Mr. Carter applied to be a trustee, and applied for self-help classes, but was denied because of his disability.

66.     Mr. Carter remains unable to walk or stand because of numbness in his left leg; he suffers pain and numbness throughout his body; he is unable to control his bladder; he is unable to maintain an erection; he has gained an excessive amount of weight; and he has experienced various forms of mental distress.

67.     Since his release, Mr. Carter has finally been able to begin seeing a neurosurgeon to address his significant head and spinal injuries caused by Defendants.

68.     Mr. Carter is now unable to lift heavy objects. As a result, he could no longer serve as a manager for a retail store as he had in the past. As a result, he has also suffered economic losses.

## V.     CLAIMS FOR RELIEF

### COUNT I
### Negligence (All Defendants)

69.     Plaintiff incorporates all paragraphs in this Complaint.

70.     Defendants, as jailers, had a duty to care for the safety of inmates in their custody, and protect inmates in their custody from harm.

71.     Plaintiff was an inmate in the custody of Defendants.

72.     Defendants breached this duty with their acts and omissions, when they required Plaintiff to shower in knowing unsafe conditions. These acts and omissions created an unreasonable risk of injury to Plaintiff.

73.     Defendant Jordan breached these duties by requiring Plaintiff to use a moldy slippery shower with standing water where Plaintiff showered, dried, and changed while requiring Plaintiff to stand on top of wet soapy milk crates, one of which had a large hole.

74.     Further, Defendant Brown, further breached these duties by failing to allow Plaintiff to shower in the handicap shower. Defendant Brown was aware Plaintiff had limited

12

mobility. Plaintiff repeatedly requested mobility assistance devices, but Defendant Brown refused to provide them, and Plaintiff was ordered by medical staff to use a handicap accessible shower.

75.    The risks and harms that Defendants caused were within the scope of protection afforded by the duties they owed to Plaintiff.

76.    Defendants knew or should have known of these risks, but failed to make the showers safe, or take adequate steps, to make the shower safe.

77.    Defendants breach of its duty of care, through its acts and omissions, resulted in Plaintiff's injuries.

78.    Defendants are responsible for the acts and omissions of their employees.

COUNT II
**ADA Failure to Accommodate (against Sheriff Brown)**

79.    Plaintiff incorporates all other paragraphs in this complaint.

80.    Jackson Parish Correctional Facility is a public entity.

81.    Plaintiff is a qualified individual with a physical or mental impairment substantially limits one or more of his major life activities

82.    Plaintiff's disability was open, obvious and apparent.

83.    Plaintiff requested accommodations for his disability including use of a handicap shower, a bed low to the ground, use of a wheelchair and facilities which were accessible in a wheelchair.

84.    Defendant Brown was aware of Plaintiff's disability and its consequential limitations.

85.    Defendant failed to make reasonable accommodations for Plaintiff.

86.    Defendant discriminated against Plaintiff because of his disability.

87.     As a result of Defendant's failure to make accommodations, because of Plaintiff's disability, his mobility was limited, and Plaintiff was excluded from  prison benefits, services, programs or activities, including but not limited to the ability access common areas, access to showers, bathrooms, microwaves, telephones, access to his own sleeping area, access to exercise that non-disabled inmates had access to. Access was either impossible, unsafe, or extremely painful and in violation of his medical providers orders.

COUNT III
**Section 504 of the 1973 Rehabilitation Act (Against Sheriff Brown)**

88.     Jackson Parish Correctional Center receives federal financial assistance.

89.     Plaintiff is a qualified individual with a physical or mental impairment substantially limits one or more of his major life activities.

90.     Plaintiff's disability was open, obvious and apparent.

91.     Plaintiff requested accommodations for his disability including use of a handicap shower, a bed low to the ground, use of a wheelchair and facilities which were accessible in a wheelchair.

92.     Defendant Brown was aware of Plaintiff's disability and its consequential limitations.

93.     Defendant failed to make reasonable accommodations for Plaintiff.

94.     Defendant discriminated against Plaintiff because of his disability.

95.     As a result of Defendant's failure to make accommodations, because of Plaintiff's disability, his mobility was limited, and Plaintiff was excluded from  prison benefits, services, programs or activities, including but not limited to the ability access common areas, access to showers, bathrooms, microwaves, telephones, access to his own sleeping area, access to exercise

14

that non-disabled inmates had access to. Access was either impossible, unsafe, or extremely painful and in violation of his medical providers orders.

## COUNT IV
### Violations of the Louisiana Constitution of 1974, Article I, Section 12 (Against Sheriff Brown)

96.    The Louisiana Constitution guarantees that "[i]n access to public areas, accommodations, and facilities, every person shall be free from . . . arbitrary, capricious, or unreasonable discrimination based on . . . physical condition."

97.    Jackson Parish Correctional Facility is a public entity.

98.    Plaintiff is a qualified individual with a physical or mental impairment substantially limits one or more of his major life activities.

99.    Plaintiff's disability was open, obvious and apparent.

100.    Plaintiff requested accommodations for his disability including use of a handicap shower, a bed low to the ground, use of a wheelchair and facilities which were accessible in a wheelchair.

101.    Defendant Brown was aware of Plaintiff's disability and its consequential limitations.

102.    Defendant failed to make reasonable accommodations for Plaintiff.

103.    Defendant discriminated against Plaintiff because of his disability.

104.    As a result of Defendant's failure to make accommodations, because of Plaintiff's disability, his mobility was limited, and Plaintiff was excluded from  prison benefits, services, programs or activities, including but not limited to the ability access common areas, access to showers, bathrooms, microwaves, telephones, access to his own sleeping area, access to exercise

15

that non-disabled inmates had access to. Access was either impossible, unsafe, or extremely painful and in violation of his medical providers orders.

## VI.     RELIEF REQUESTED

Wherefore Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

    a.   Declaratory relief;

    b.   Injunctive relief;

    c.   Judgment against Defendants for Plaintiff's asserted causes of action;

    d.   Award of compensatory damages;

    e.   Award of punitive damages;

    f.   Award costs and attorney's fees;

    g.   Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

[SIGNATURE LINE FOLLOWING ON NEXT PAGE]

Respectfully submitted,

Respectfully submitted this 12th day of November, 2019.

/s/ Casey Denson_____
**Casey Rose Denson, Esq.**
Casey Denson Law, LLC
3436 Magazine Street, Unit #7005
New Orleans, LA 70115
Telephone: (504) 224-0110
E-mail: cdenson@caseydensonlaw.com
Attorney for Plaintiff

_/s/ Kenneth Bordes_____
**Kenneth Bordes, Esq.**
Kenneth C. Bordes, Attorney at Law, LLC
2725 Lapeyrouse Street
New Orleans, LA 70119
Telephone: 504-588-2700
Email: kcb@kennethbordes.com
Attorney for Plaintiff

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of November, 2019, a true and correct copy of the foregoing was delivered via email to:

Eli Meaux, EMeaux@provosty.com
Brad Calvit, BCalvit@provosty.com
Shane Bryant, sbryant@usryweeks.com

_/s/ Kenneth Bordes_____
**Kenneth Bordes, Esq.**
Kenneth C. Bordes, Attorney at Law, LLC
2725 Lapeyrouse Street
New Orleans, LA 70119
Telephone: 504-588-2700
Email: kcb@kennethbordes.com
Attorney for Plaintiff

17